**M. E. GRAYBEAL et al., Appellants,**

v.

**Christopher B. McNEVIN, Appellee.**

Court of Appeals of Kentucky.

March 28, 1969.

Fritz Krueger, Somerset, Ben D. Smith, Somerset, for appellants.

M. D. Harris, Somerset, for appellee.

EDWARD P. HILL, Judge.

The judgment from which this appeal is prosecuted enjoins the fluoridation of the water system in Somerset, Kentucky, and adjoining area. We reverse the judgment. The questions herein presented have not heretofore been presented or decided by this court, although fluoridation of public water supplies has been in operation in Newburgh, New York, and Grand Rapids, Michigan, since 1945. Maysville, Greensburg, and Louisville in 1951 were the first Kentucky cities to fluoridize their water supplies.

This suit was filed by appellee, Christopher B. McNevin, a doctor of chiropractic in Somerset, against M. G. Graybeal and Kentucky Water Service Company. Later the Kentucky State Board of Health was permitted to intervene.

In May 1966, the State Board of Health, acting pursuant to KRS 211.090(1) (d) and 211.180, adopted an amendment to Regulation C-NEG-2, Fluoridation of Public Water Supplies, by which cities of the first four classes are permitted to "adjust deficient waters to an optimum fluoride content for the protection of the dental health of the people served by the supply."

The regulation provided that approval by the Department of Health was made contingent upon provision by the supplier of fluoridation insuring adequate control and supervision and safe operation and maintenance. Requirements as to equipment, facilities, and service were rigidly prescribed, covering reliable feeding equip-

ment and the rate of feed, protection of operators, separate storage of the fluoride chemical, laboratory facilities, testing and sampling and the submission of samples to the department. Other safety provisions were embodied in the regulation.

Memoranda were issued to mayors and water plant superintendents, including those of Somerset, advising them that the water systems of those cities in which fluoridation was not installed within six months would be classified as "provisional" in lieu of the "approved" rating existing before the adoption of the regulation, which according to appellee amounted to the approval of fluoridation and a downgrading of the water system of those not complying with the regulation.

The regulation fixed the "optimum fluoride content" of public water supplies to be achieved by the regulation to be one-part fluoride per one-million parts of water.

The Somerset water system, built in 1957, included a separate room and some facilities for fluoridation in anticipation of future use.

On January 23, 1967, the city council of Somerset adopted a resolution requesting appellant Kentucky Water Service Company to "install as soon as possible" the necessary equipment to introduce fluoride into the city water system. This company has been the supplier of public water in Somerset since 1957.

Appellee questions the validity of the regulation referred to above by charging that the regulation (1) is in violation of KRS 315.020, regulating the dispensing of drugs; (2) violates his "right to freedom of religion"; (3) violates his rights under section one of the Fourteenth Amendment to the Constitution of the United States; (4) is "arbitrary and in violation of section two of the Constitution of Kentucky." He further asserts that he had no opportunity to be heard and was denied due process; and that the proposed action by the city will do incalculable harm to his health, to the health of his family, and to other consumers.

After a lengthy trial by the court without a jury, the trial court fully agreed with plaintiff and granted the permanent injunctive relief sought. The State Board of Health and the Kentucky Water Service (hereinafter Water Service) have appealed. Fluoridation had been commenced February 10, 1967, but was discontinued by the injunction herein on April 7, 1967.

By Chapter 211 of KRS the legislature has wisely recognized and declared that the public health is an "essential function" of the government of this Commonwealth. KRS 211.005. "The relation of dental hygiene to the health of the body generally is now so well recognized as to warrant judicial notice." See Dowell v. City of Tulsa, Okl., 273 P.2d 859, 43 A.L. R.2d 445 and KRS 211.180.

The State Board of Health is empowered to "adopt rules and regulations." KRS 211.090(1) (d).

Among the police powers of government, the power to promote and safeguard the public health ranks at the top. If the right of an individual runs afoul of the exercise of this power, the right of the individual must yield.

The State Board of Health is composed of ten members, including the Commissioner of Health. One member must be a registered pharmacist, one a licensed dentist, one a licensed osteopath, and the remaining six members shall be "licensed medical physicians." It is a regulation of this board in the field of fluoridation, a medical-scientific field, that appellee McNevin petitions the court, composed of men of law, not medicine or science, to set aside and hold for naught.

The general rule in regard to judicial review of rules and regulations of ad-

ministrative agencies is thus stated in 42 Am.Jur., Public Administrative Law, § 209:

"In general, in the absence of valid statutory provisions or other factors affecting the scope and extent of judicial review, administrative determinations will not be interfered with by the courts unless, but will be interfered with where, the determination is beyond the power which could constitutionally be vested in or exercised by an administrative authority; the determination is without or in excess of the statutory powers and jurisdiction of the administrative authority, the determination is an exercise of power so arbitrary or unreasonable as virtually to transcend the authority conferred, or is otherwise an abuse of discretion, or is in disregard of the fundamental rules of due process of law, as required by constitutional or statutory directions * * * made * * *."

■ This general rule of judicial review may not apply with equal force to a regulation by an agency composed of specialists in an area in which the courts must acknowledge a limited understanding. Speaking in this vein, it was written in Hutchinson v. City of Valdosta, 227 U.S. 303, at page 307, 33 S.Ct. 290, at page 292, 57 L.Ed. 520 that:

"It may be that an arbitrary exercise of the power could be restrained, *but it would have to be palpably* so to justify a court in interfering with so salutary a power and one so necessary to the public health [sewer control]." (Emphasis added)

See also 2 Am.Jur.2d, Administrative Law, § 633, from which we quote the following:

"Perhaps the most significant factor limiting review by the courts of action of administrative agencies generally, although undoubtedly variable in degrees appropriate to particular agencies, is the scope of the power which has been reposed in the administrative agency by statute and the informed and expert judgment of the agency based upon its accumulated experience in the matters with which the statute is concerned. Courts often advert to the expertness, special competence, specialized knowledge, or experience of the administrative agency which fortifies the judgment of the agency * * *."

■ . As the issues were presented in the trial court, the power of that court was limited to a determination of whether the regulation in question was arbitrary or in violation of appellee's constitutional rights in the particular respects pointed out by appellee. On the issue of arbitrariness, the burden was on the plaintiff to show that the regulation had no reasonable basis in fact or had no reasonable relation to the protection of the public health. The constitutional question was one of law. Probably the true test of arbitrariness would depend on the evidence the board had before it when it adopted the resolution. But the parties went beyond this test and proceeded to offer evidence in circuit court, so we consider the case as practiced.

■ We must look to the facts in this record and the facts before the board when it adopted the regulation to determine whether the finding of the trial court of arbitrariness is "clearly erroneous." CR 52.01. Necessarily this will be a lengthy process due to the importance we attach to the qualification of the witnesses.

We first discuss appellants' witnesses and their evidence.

Dr. Russell E. Teague has been Commissioner of Health in Kentucky since 1956, and is a member of the State Board of Health. He has been with the State Department of Health since 1930 except for a one-year leave to earn a master's degree in public health and epidemiology at Johns Hopkins. He was president of the American Association of State and Territorial Health Commissioners in 1967.

Dr. Teague testified that of Kentucky's 3,000,000 population the number served by public water supplies is 1,800,000, and out of this number some 1,200,000, or 64 percent, drink water containing fluoride; that extensive studies and tests were made preceding the use of fluoridation in this state. The first test showed dental defects in 90 percent of the school children. After 10 years' use of fluoride, these tests showed a 90-percent reduction in dental defects in school children; that recent tests in Louisville, Maysville, and Ashland showed similar results; that significant benefits also accrue even where availability of fluoride is deferred to later years, and these benefits continue into and through old age; that there is substantial evidence that controlled fluoridation produces stronger bone structure, beneficial to older people. Dr. Teague testified that modern fluoride equipment is safe and presents no health problem and that proper fluoridation "does not in any sense produce harm to the health of the people."

Nick G. Johnson, Director, Sanitary Engineering Program, Division of Environmental Health, State Department of Health, is responsible for enforcement of public water supply regulatory measures. He has a bachelor's degree in civil engineering from the University of Louisville, and a master's degree in sanitary engineering from the University of Michigan. He has been with the Department of Health for 20 years. He testified that all requirements and specifications of the regulation were fully met, both as to equipment and management personnel.

Dr. M. A. Shepherd is the Regional Medical Director, Central Region (embracing 20 counties), State Department of Health. He is a physician with 12 years' experience in this work with headquarters in Somerset. He practiced medicine there before his association with the Department of Health. He stated that there was a great demand by the citizens of Somerset for fluoridation. He said:

"As a public health physician certainly it has been my duty to research the literature in the field of public health and I have read extensively in the literature etc., there has been no documented evidence of any danger or any damage done from using fluorided public water. * * * Every national health organization in the United States that speaks with authority on the benefits and safety of fluoridation has adopted policies favorable to the measure. * * * They * * * [include] the American Dental Association, American Medical Association, American Association of Public Health Dentists, Association of State and Territorial Dental Directors, Association of State and Territorial Health Officers, National Research Council, U. S. Public Health Service, American Association for the Advancement of Science, American Academy of Pediatrics, Commission on Chronic Illness, Inter-Association Committee on Health, American Society of Dentistry for Children, American Public Health Association, American Academy of Dental Medicine, Canadian Dental Association, Canadian Medical Association, Canadian Public Health Association, International Dental Federation, American Pharmaceutical Association, National Congress of Parents and Teachers, American Federation of Labor and Congress of Industrial Organizations, American Legion, U. S. Junior Chamber of Commerce."

Dr. E. D. Gernert has the D.M.D. and M.P.H. degrees. He is professor of community dentistry, University of Louisville, and was Director of Dental Health, State Department of Health, until 1967.

Dr. Gernert testified he has closely followed the development of fluoridation since 1945 and studied the various tests and research on the subject; that he participated in various studies himself; that he and his associates "accumulated base line statistics on the condition of children's

mouths and * * * took a mortality and morbidity rating on these communities" [Maysville, Greensburg, and Louisville] and that they followed these studies periodically; that they "found that when the children had full benefits of fluoridation from birth on there was a 60% reduction in tooth decay." That there was "no evidence of any impairment to health in these children from the study of the morbidity and mortality rates."

Dr. Gernert further stated:

"Long before 1945 when Newburgh, New York, was fluoridated, we were certain there was no detriment to health from fluoride in the diet or water, and the question at that time was whether we could actually put the fluoride in and control it without too much expense and too much difficulty. Of course, the Newburgh studies and the Grand Rapids studies, and others assured us that this could be done. Extensive studies in Newburgh, New York, health study of the general health of the patient, blood studies, bone studies, X-ray studies and everything else were conducted during this procedure or method of fluoridation, so that long before 1951 when we advocated fluoridation for communities in Kentucky, in my opinion there was no question as to the safety of the procedure, and this has been borne out by sixteen years of experience in fluoridation in community water supplies in this state."

He also stated that fluoridation process does not constitute the dispensing of drugs or medicine; that fluoridation is not a medication, it is a "nutrient which produces stronger teeth and bones"; that fluoridation is "one of the great discoveries of our time"; and that it "is safe."

A. B. Coxwell, D.M.D., is executive secretary of the Kentucky Dental Association and has practiced dentistry for 20 years. He testified that the House of Delegates of the Kentucky Dental Association passed a resolution "demanding that the State Board of Health take action to see that the water system of the State of Kentucky be adequately fluoridated"; that "every known accredited organization in the world has approved the fluoridation of water supplies for the prevention of dental caries"; that he had never seen "any evidence of any harm done to any one" due to fluoridation.

Dr. Pat H. Lyddan, a pedodontist, with a D.D.S. degree, has served as president of the Kentucky Dental Association, and as an instructor in children's dentistry at the University of Louisville for 22 years. Dr. Lyddan gave this answer to a question as to his experience:

"After the water was fluoridated in Louisville, within two or three years after the water was fluoridated, we began to see in our practice and this was not only true in my practice but in the practice of well, I will get to that in a moment, the nature of my practice changed remarkably. Up until that time we were fighting a losing battle just to be able to restore all the decaying teeth, and in a period of about three years our practice changed to one where we were able to do more preventive dentistry, or what we call interceptive dentistry or preventive dentistry and to educate the parents, and also the patients to try to prevent tooth decay, due to the fact that we had this 60% reduction in decay, because of fluoridation of our local water supply. Also in addition the American Society of Dentistry for Children made a study of pedodontics all over the country, and in areas where the water was fluoridated, the result bore out the statement that I made, that all of us who practice in fluoridated areas, that our practice changed from 80 or 90 percent restorative dentistry, or trying to restore and fill the decayed teeth, to something like 60% of our practice became more or less a maintenance and preventive type of practice."

When asked as to whether he knew of any harm due to fluoridation, he said:

"No, I have not. In addition during the war I lived in a community in Texas where the water contained from 2½ to 3⅓ parts fluoride, naturally, and in addition to not having very much cavities, the general health of all the people in this community was excellent."

Dr. Alvin L. Morris has the D.D.S. and Ph.D. degrees and has been Dean of the University of Kentucky College of Dentistry since 1961. He gave this answer as to the effect of fluoridation:

"It is the responsibility of the Dean to serve as the major administrative officer of the academic institution, also to engage in instruction and some research. * * * The evidence is overwhelming that water containing one part per million of fluoride will result in the reduction of new cavities developing in children to the extent of approximately 60 per cent. During my past experience in academic life I have had the privilege of serving as a colleague for three years with Dr. Harold Hodge, and Dr. Frank Smith, of the University of Rochester. These gentlemen have been responsible for doing the major research relative to the benefits of fluoride on biologic tissues. Their research, which was taking place during the time I was working with them revealed unequivocally that there would be no detrimental or harmful effects to the health of anyone consuming a water supply containing one part per million. Their research has been regarded as the key work, and the earliest work for establishing this fact on an experimental basis. Since that time, the experience with some 63 million Americans who have been and are drinking public water supplies with fluoride added to these amounts has completely substantiated their research."

Dr. D. L. Gambrall, D.M.D., M.P.H., is Acting Director, Dental Health Program of the State Department of Health. His M.P.H. degree is from the University of Michigan. He stated:

"During my first year with the State Health Department I was in the clinical program. In this program we provided care to children throughout the state, indigent children, mostly. In many areas I worked on children who did not have the benefit of fluoridated water. The prevalence of caries was immense. In other areas we did get to work on children who had had fluoridated water, and had received fluoride for their entire lives, and there was, you would note immediately a tremendous reduction in dental decay in the range of 60 per cent or better."

W. L. Williams had been with the Louisville Water Company for 20 years. He was superintendent of the purification plant and has a bachelor's degree in chemistry and a master's degree in bacteriology. He had been an instructor on these subjects in high schools and at the University of Louisville Medical College for 19 years. When asked about the corrosive effects of fluoride on water pipes, Mr. Williams replied: "It is generally known that fluoride causes no corrosion at all." He stated that over one-half million people are served by the Louisville Water System, and in all the thousands of complaints by water consumers "none of them had anything to do with fluoride."

F. J. Maier is a consulting engineer for Pan-American Health Organization, with 33 years' experience in sanitary engineering,[1] part of which period he was in charge of a laboratory in Bethesda, Maryland, relative to the problems associated with fluoride in water. He was asked this question and gave the following answer:

"Q.5 Mr. Maier, during the time you headed up the fluoridation pro-

1. This experience was with the U.S. Public Health Service.

gram of the United States Public Health Service, did you learn of any ill effects on any person throughout the United States from having consumed fluoridated water that was properly administered, that is, proper amounts?

"A. We have no single instance in the United States, or anywhere in the world where fluoridation is practiced that this has occurred."

He also stated he never in all his years of experience had heard of fluoride causing corrosion in water pipes. He gave testimony that the equipment proposed at Somerset was standard, safe equipment.

There was other testimony by other disinterested, qualified witnesses for appellants, and we have given only the high points in the testimony of the witnesses to whom we have just referred.

We turn now to the evidence offered by appellee in opposition to fluoridation.

Appellee, Dr. McNevin, a local chiropractor, testified that sodium fluoride is a virulent poison, a fact which is admitted by the appellants; that when fluoridation was commenced he became alarmed for the safety of himself and his family; and that the consumption of fluoridated water would be injurious to them.

Dr. Ray McPike, a Louisville chiropractor, testified that fluoride does not treat water, but instead treats people and introduced a number of exhibits, over the appellants' objection, indicating the continued consumption of fluoride would be harmful to children.

George Whatley Massey, a graduate of Ohio State University, a student at Georgia Institute of Technology, and an instrumentation engineer of Knoxville, Tennessee, testified that ingestion of anything over 1.25 PPM is likely to be toxic and that this is the "safe" amount claimed by the U. S. Public Health Service; that fluoride is corrosive in pipes as shown by

experience in the cities of Pittsburgh, Miami, Concord, New Hampshire, and Andover, Massachusetts; that in Pittsburgh it was necessary to add 3 PPM at the water plant to get the recommended 1 PPM at the tap; that the surplus fluoride concentrated and remained in water pipes up to 8,000 PPM in Concord and that 400 PPM is a lethal dose; that evidence from the Grand Rapids, Philadelphia, and Evanston, Illinois, experience indicated that children drinking fluoridated water do not get fewer cavities but only an approximate three-year delay; that the safety factor of the ingestion of fluoride is 0; that fluoride concentrates of 6,000 PPM were found in 16-inch water mains, and of 2,500 PPM in a ¾-inch house water line in fluoridated San Francisco, and that in Concord, New Hampshire, where no fluoride had been added to the water supply for two weeks it was found the water still had a concentration of 2.8 PPM.

Cecil Petard, M.D., of Knoxville, Tennessee, a practicing physician for 16 years, a member of the American Medical Association and of the Association of American Physicians and Surgeons, testified that the American Medical Association is not prepared to state that "no harm will be done to any person by water fluoridation" and has not carried out any research, either long-term or short-term, regarding the possibility of any side effects; that the AMA does not guarantee the safety of fluoridated water; that a 1963 article published in the American Journal of Diseases of Children stated it is unnecessary and unwise to add fluoride to drinking water for the reasons, among others, that the dosage is highly variable and inaccurate and that older children and adults need not and should not be dosed with the drug; that he has two patients who have been harmed and suffered illness from drinking fluoridated water from a public water supply; that the Association of American Physicians and Surgeons, Inc. in San Francisco on April 12, 1958, adopted a resolution condemning the addition of

any substance to public water supplies for the purpose of affecting the bodies or mental functions of consumers; that there is evidence to indicate that fluoridation increased the death rate in Grand Rapids over the area outside the city, and unfluoridated Knoxville, Tennessee, has a death rate lower than the state average; that fluoridation increases the incident of mongoloid births to an alarming degree.

Dr. Petard further testified there is considerable disagreement among the doctors of Knoxville over the desirability of fluoridation as a health measure, and that he as a physician was not in favor of adding fluoride to public drinking water because he would rather wait until better evidence is in, an opinion in which he is apparently joined by the United States Veterans Administration and opposed by the United States Public Health Service. Dr. Petard also testified that very few dentists in Knoxville prescribed fluoride for the teeth of patients.

Mr. J. V. Adams of New Albany, Indiana, with a bachelor's degree in chemistry, a master's degree in public health from the University of Michigan, a director's degree in health and safety from Indiana University, and who is now working on a doctorate degree, testified that sodium fluoride is a poison, originally used as a rat and roach killer, and that continued ingestion of fluoride over a period of time would accumulate in the human body; that his experiments indicated that certain foods contain high concentration of fluoride and that it is the highest and strongest chemical; that it concentrates and accumulates in water pipes and in the body; that people ingest it in varying quantities by eating, breathing, and drinking water, and that it is the highest form of poison, is not a nutrient and has no food value; that the United States Public Health Service recommended the addition of iodine to the public water supplies several years ago, then changed their position when they discovered it was producing certain systematic disorders—especially goiter; that fluoride cannot be controlled and that it affects the blood cells and nuclear cells in the human body.

It is apparent that appellee's witnesses had had no applicable experience with fluoridation. They testified, for the most part, from information in newspapers and pamphlets, one of which was published by the Pure Water Association of Fresno, California. A large part of appellee's evidence is based on hearsay. See Kentucky Public Service Co. v. Topmiller, 204 Ky. 196, 263 S.W. 706 (1924); and 32 C.J.S. Evidence § 717.

■ After considering the experience and qualification of appellants' witnesses and the lack of experience and qualification of appellee's witnesses, and the studies, tests, experiences, and recommendations of practically all the people and organizations into whose care the health of this nation has been entrusted, we conclude plaintiff failed in his burden to prove the resolution was arbitrary and that the finding of the trial court is clearly erroneous. Nourse v. City of Russellville, 257 Ky. 525, 78 S. W.2d 761 (1935); and City of Louisville v. Thompson, Ky., 339 S.W.2d 869 (1960).

In Jacobson v. Massachusetts, 197 U.S. 11, 25 S.Ct. 358, 49 L.Ed. 643 (1905), the Supreme Court said writing on a kindred question of appellate review:

"If there is any such power in judiciary to review legislative action in respect of a matter affecting the general welfare, it can only be when * * * a statute purporting to have been enacted to protect the public health, the public morals, or the public safety has no real or substantial relation to those objects or is, *beyond all question*, a plain, palpable invasion of rights secured by the fundamental law." (Emphasis added.)

Although this court has not had occasion to determine the legality of fluoridation, at least fourteen states have done so. See

De Aryan v. Butler, 119 Cal.App.2d 674, 260 P.2d 98, cer. den. 347 U.S. 1012, 74 S. Ct. 863, 98 L.Ed. 1135 (1953); Dowell v. City of Tulsa, Okl., 273 P.2d 859, 43 A.L.R. 2d 445, cer. den. 348 U.S. 912, 75 S.Ct. 292, 99 L.Ed. 715 (1954); Chapman v. City of Shreveport, 225 La. 859, 74 So.2d 142, app. dis. 348 U.S. 892, 75 S.Ct. 216, 99 L.Ed. 701 (1954); Kraus v. City of Cleveland, 163 Ohio St. 559, 127 N.E.2d 609, app. dis. 351 U.S. 935, 76 S.Ct. 833, 100 L.Ed. 1463; Kaul v. City of Chehalis, 45 Wash.2d 616, 277 P.2d 352 (1955); Froncek v. City of Milwaukee, 269 Wis. 276, 69 N.W.2d 242 (1955); Baer v. City of Bend, 206 Or. 221, 292 P.2d 134 (1956); Wilson v. City of Council Bluffs, 253 Iowa 162, 110 N.W.2d 569 (1961); Readey v. St. Louis Country Water Co., Mo., 352 S.W.2d 622 (1961); City Commission of City of Fort Pierce v. State ex rel. Altenhoff, 143 So.2d 879 (Ct. App.Fla.1962); Schuringa v. City of Chicago, 30 Ill.2d 504, 198 N.E.2d 326 (1964); Rogowski v. City of Detroit, 374 Mich. 408, 132 N.W.2d 16 (1965); Hall v. Bates, 247 S.C. 511, 148 S.E.2d 345 (1966); Paduano v. City of New York, 17 N.Y.2d 875, 271 N.Y.S.2d 305, 218 N.E.2d 339 (1966); Attaya v. Town of Gonzales, 192 So.2d 188 (Ct.App.La., 1966); Birnel v. Town of Fircrest, 53 Wash.2d 830, 335 P.2d 819 (1959); and Wilson v. City of Mountlake Terrace, 69 Wash.2d 148, 417 P.2d 632 (1966).

In *De Aryan, Dowell, Chapman* and *Kraus, supra,* the Supreme Court either denied certiorari or dismissed the appeal.

 We find no merit in appellee's contention that fluoridation of public water supplies violates his rights under the first section of the Fourteenth Amendment to the Constitution of the United States or section two of the Constitution of Kentucky or KRS 315.020. See Dowell v. City of Tulsa, *supra.*

During a period of over 20 years fluoridation has come through the experimental stage with flying colors. True, there have been critics of the system, and it has borne the blame for many defective water systems, many of which resulted from other causes. Any endeavor of such magnitude as fluoridation may encounter some imperfections due to human or mechanical error, but the benefits so far outweigh the disadvantages the endeavor is justified.

Nearly every great medical and scientific discovery has fought the battle of "trial and error" and has been opposed by the skeptics and the incredulous. But progress demands that research persist unhampered by the courts.

The judgment is reversed with directions to dissolve the injunction and dismiss the complaint.

All concur.